EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
RUTH C. PINKEL (Cal. Bar No. 164470)
Assistant United States Attorney
Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6077
     Facsimile: (213) 894-7631
     E-mail:    ruth.pinkel@usdoj.gov
POONAM G. KUMAR (Cal. Bar No. 270802)
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorneys
General Crimes Section
     1200/1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0719/6527
     Facsimile: (213) 894-0141/6269
     E-mail:    poonam.kumar@usdoj.gov/scott.paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>                  v.<br><br>EMINIANO "JUN" REODICA, JR.,<br><br>             Defendant. | No. CR 94-121-SJO<br><br>GOVERNMENT'S OBJECTIONS TO THE<br>PRESENTENCE REPORT<br><br>Hearing Date: April 25, 2016<br>Hearing Time: 9:00 A.M.<br>Location:     Courtroom of the<br>              Hon. S. James Otero |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Ruth C. Pinkel,

Poonam G. Kumar, and Scott Paetty, hereby files its Objections to the

Presentence Report.

These Objections are based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 17, 2016                Respectfully submitted,

                                     EILEEN M. DECKER
                                     United States Attorney

                                     LAWRENCE S. MIDDLETON
                                     Assistant United States Attorney
                                     Chief, Criminal Division


                                     _____/s/_____
                                     RUTH C. PINKEL
                                     POONAM G. KUMAR
                                     SCOTT PAETTY
                                     Assistant United States Attorneys

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

On February 16, 1994, defendant Eminiano "Jun" Reodica ("defendant") was indicted on 52 counts of bank fraud and making false statements to a bank, in violation of 18 U.S.C. §§ 1344, 1014. Defendant, who had fled the United States in August of 1988, was arrested at Los Angeles International Airport ("LAX") on November 27, 2012. After several continuances, this case was set for trial on October 6, 2015. On October 5, 2015, defendant provided notice of his intent to plead guilty to the 26 remaining counts of the indictment and entered his change of plea later that same day. The parties did not enter into a plea agreement.

On March 3, 2016, the United States Probation Office ("USPO") issued its Presentence Report ("PSR"). Using the 1987 version of the Sentencing Guidelines, the USPO calculated the base offense level as 6 and applied a 13-level enhancement for loss exceeding $5 million, a two-level enhancement since the offense involved more than minimal planning as well as a scheme to defraud more than one victim, a four-level enhancement for aggravating role. This calculation resulted in an adjusted offense level of 23. The USPO then deducted two levels for acceptance of responsibility and calculated a total offense level of 21. Since defendant's known criminal history category is I, the PSR calculated the guideline range to be 37 to 46 months of imprisonment.

The government objects to the following portions of the PSR: (1) its application of a two-level reduction for acceptance of responsibility; (2) its failure to find a loss of approximately $90,000,000; and (3) its determination that restitution need not be

ordered due to the age of the case and pursuant to 18 U.S.C. § 3663(d).

**II.  STATEMENT OF FACTS**

Defendant Eminiano Reodica, Jr., aka Jun Reodica ("defendant") pleaded guilty to twenty-six counts of bank fraud and false statements in connection with loan applications in violation of 18 U.S.C. §§ 1344 and 1014.[1]  More particularly, defendant pleaded guilty to nine counts of bank fraud in violation of 18 U.S.C. § 1344 (Counts 1, 2, 18-20, 22, 31, 32, 41) and 17 counts of false statements in connection with loan applications in violation of 18 U.S.C. § 1014 (Counts 4-6, 25-27, 29, 33-40, 49, 50).  These charges stem from defendant's orchestration of a scheme to defraud at least five federally insured financial institutions while he was running the second largest Chevrolet dealership in the United States, which was also the third largest car dealership in the entire United States.

Defendant was the owner, principal shareholder, president and chief operating officer of the Grand Wilshire Group of Companies ("GWG"), which was headquartered in Glendora, California.  (PSR ¶ 8.) GWG included both dealerships (Grand Chevrolet and Grand Motors) as well as businesses involved in the financing and leasing of automobiles (Grand Wilshire Finance ("GWF"), Grand Wilshire Leasing ("GWL"), Glendale Leasing ("GL"), Grand Rizal Finance ("GRF"), and Grand Wilshire Capital ("GWC")).  GWG's car dealerships operated out of approximately twenty-five locations throughout California.  Many

---

[1] Defendant was originally charged in a 52-count indictment.  On September 18, 2015, the government submitted a redacted trial indictment (CR Dkt. No. 95) setting forth the 26 counts on which it intended to proceed at trial.

GWG customers financed their auto purchases with a loan from a GWG-affiliated company.

To finance its general operating expenses, GWG, through its related companies, obtained lines of credit from a number of financial institutions, including the following federally-insured financial institutions listed as victims in the indictment:  Union Bank, Imperial Savings, First Los Angeles Bank, Manilabank, and First Central Bank.  (PSR ¶ 9.)  Under the terms of the contracts with the banks, GWG was required to pledge automobile contracts as collateral, collect payments from the customers, remit those payments to the lenders, and notify the lenders of delinquent contracts.  (PSR ¶ 10.)

Defendant's scheme to defraud financial institutions was manifested in many ways, including the following: (1) simultaneously double-pledging of collateral to two different lenders, either by forging and duplicating motor vehicle contracts or repossessing cars and reselling them without notification to the lenders; (2) fronting of payments on behalf of delinquent customers in order to avoid having to repay those loans; and (3) requiring employees through the Employee Loan Investment Program ("ELIP") to falsely apply for loans for cars of which they did not take possession or make payments on and for which the proceeds of the loans applied for by the employees was directed to the operating capital of the company.  (PSR ¶¶ 12-29.)

The scheme collapsed in approximately June and July 1988, when Imperial Savings discovered defendant's fraud.  Due in part to defendant's conduct, Imperial Savings later failed and was taken over by the Resolution Trust Corporation (which was later succeeded by the FDIC).

## III. THE PSR IMPROPERLY ACCORDED A TWO-LEVEL REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY

The PSR reduced defendant's total offense level by two because he pleaded guilty to the 26-count redacted indictment the day before trial was set in this case.  The government objects to this adjustment.  This case was originally indicted in February 1994, nearly six years after defendant fled the United States as his companies collapsed around him.  On November 27, 2012, defendant was arrested at LAX, while traveling under an assumed identity and with an Australian passport.  Trial was originally set in this matter for January 29, 2013 and after several continuances, was set for trial on October 6, 2015.  Just days before trial, at a motions hearing on October 2, 2015, defendant indicated he wanted new counsel.  (Dkt. No. 124.)  When the government returned to the courtroom following an in camera hearing, the Court denied defendant's request for new counsel and indicated that the trial would go proceed as scheduled on October 6, 2015.  The Court set a hearing for October 5, 2015 to determine whether defendant intended to proceed pro se.  At the hearing on October 5, 2015 – the day before the trial, nearly three years after defendant was arrested, and over 20 years after he was indicted – defendant stated he intended to plead guilty to all of the remaining counts of the indictment.  The significant lapse of time between indictment and the guilty pleas and the proximity of the guilty plea to the trial date undermines any acceptance of responsibility by defendant.  Indeed, defendant's flight and this lapse in time rendered the government unable to proceed with 26 counts of the indictment.  Nearly every one of defendant's acts since his fraud came to light has been inconsistent with the acceptance of

4

responsibility.  The only exception is his guilty pleas.  However,
the simple fact of these pleas, which came the day before trial, does
not "entitle[] [defendant] to a sentencing reduction under this
section as a matter of right."  U.S.S.G. § 3E1.1(c).  Moreover, the
government understands that defendant may seek to withdraw his guilty
pleas and persists in his innocence.  When taken in total,
defendant's behavior since indictment evinces a complete lack of
acceptance of responsibility and thus, the government submits that no
reduction for acceptance of responsibility is appropriate here.

**IV.    THE PSR FAILS TO APPROPRIATELY CALCULATE THE LOSS AMOUNT OR
RECOMMEND RESTITUTION**

As set forth in the PSR, the five GWG entities filed for
bankruptcy in 1988.  During the course of the bankruptcy, hundreds of
investors and numerous financial institutions filed claims
representing their loss, and the bankruptcy trustee made decisions
regarding the allowable amount of those claims.  The spreadsheets of
these loss claims, provided along with underlying bankruptcy records
to the USPO and previously produced to the defendant, attached hereto
as Exhibits A and D, present the bank and investor claims filed
publicly with the bankruptcy trustee during the GWG bankruptcies.  In
total, as set forth in Exhibits A and D, there were $90,158,550.26 in
claims, which were comprised of $64,246,964.53 in bank claims and
$25,911,585.73 in investor claims.  (PSR ¶ 33.)  The government
submits that this spreadsheet, along with the supporting records from
the bankruptcy file, serves as the reasonable estimate of the loss
caused by defendant's fraudulent conduct and thus the government
objects to the PSR's failure to determine the total loss amount.
Beyond ensuring an accurate calculation of the loss, as required by

Federal Rule of Criminal Procedure 32, a finding of loss totaling approximately $90,000,000 effects defendant's sentencing in two principal ways.  First, the $90,000,000 figure adequately captures the seriousness of defendant's offenses.  U.S.S.G. § 2B1.1, app. note 10 (1987) ("The adjustments for loss do not distinguish frauds involving losses greater than $5,000,000.  Departure above the applicable guideline may be warranted if the loss substantially exceeds that amount.").  Second, the government submits that claims data provides a sufficient basis for a restitution order in this case.

The government submits that the claims data provides a clear basis upon which the Court can find the loss and order restitution. The bank claim spreadsheet (Exhibit A) is a summary chart that sets forth all of the claims filed by the banks during the course of the bankruptcy.  In and of itself, this is a sufficient basis upon which to determine loss.  Furthermore, the amounts listed, however, are based, for at least a portion of the claims, on the amount of the claims allowed by the bankruptcy trustee.  In the instances where the chart indicates that it was the "[c]laim amount listed in Order on Motion objection to claims", the chart lists the amount allowed by the Court following an objection filed by the bankruptcy trustee. The referenced Order is attached hereto as Exhibit C.[2]  The total of these bank claims, as listed by the chart, is over $64 million. Indeed, this chart underrepresents the loss amount because, as set forth in Exhibit B, the Federal Deposit Insurance Corporation ("FDIC"), acting as a receiver for the failed Imperial Savings Bank

---

[2] The bankruptcy court allowed $660,000 of the loss submitted by Dai-Ichi Kangyo Bank.  See Exhibit C.

("ISA"), settled all claims with the trustee for $33.5 million, $7.5 million more than the amount listed on the spreadsheet.

As for the individual investor claims, the chart attached as Exhibit D  is a summary chart of individual investor claims filed in the bankruptcy and sets forth where there is a promissory note or other stock certificate to support the claim and when the defendant, himself, signed the certificate.  These claims add over $25 million to the total loss.  Attached as Exhibit E is a representative sample of investor claims publicly filed in the bankruptcy and summarized in Exhibit D.

As such, the government submits that the bankruptcy trustee's findings as to this issue establish by clear and convincing evidence that the loss amount is over $90 million.  In the PSR, the USPO states that it has "concerns that the total amount of filed claims, in fact, represents loss arising from the instant offense.  The Probation Officer is cognizant that these claims may also include amounts not directly emanating from the defendant's fraudulent conduct."  (PSR ¶ 45.)  However, the GWG bankruptcies were predicated on the fact that the banks called in their lines of credit, because the lines were based almost entirely on the fraud and misrepresentations made by defendant to the banks.  However, as the USPO sets forth in the PSR, the Court need only make a reasonable estimate of the range of loss; the government submits that the bankruptcy trustee's findings on this score is exactly that, a reasonable estimate of the loss.

Citing 18 U.S.C. § 3663(d), the PSR found that the complication and prolongation of calculating a restitution order "outweighs the need to provide restitution to any victims."  (PSR ¶ 90.)  The

7

government respectfully disagrees.  The claims data from the
bankruptcies of defendants' companies renders the process of
determining restitution substantially simpler than the average
criminal fraud case.  In the bankruptcy process, the victims had to
submit claims paperwork.  The government also objects to the
determination that any difficulty in calculating restitution
outweighs the need to order restitution to any victims.  The victims,
both banks and individuals, suffered great losses at the hands of
defendant.  Moreover, defendant should not be permitted to escape his
restitution obligations because he fled for 24 years.  As such, the
government submits that a restitution order consistent with the
claims data attached hereto as Exhibits A and D should be entered in
this case.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests
that this Court sustain the government's objections to the PSR.