SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
RUTH C. PINKEL (Cal. Bar No. 164470)
Assistant United States Attorney
Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6077
     Facsimile: (213) 894-7631
     E-mail:   ruth.pinkel@usdoj.gov
POONAM G. KUMAR (Cal. Bar No. 270802)
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0719/6527
     Facsimile: (213) 894-6269
     E-mail:   poonam.kumar@usdoj.gov/scott.paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 94-121-SJO |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: May 15, 2017 |
| | Hearing Time: 9:00 A.M. |
| EMINIANO "JUN" REODICA, JR., | Location:   Courtroom of the |
| | Hon. S. James Otero |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Ruth C. Pinkel,
Poonam G. Kumar, and Scott Paetty, hereby files its Sentencing
Position.

This sentencing position is based upon the attached memorandum of points and authorities, the Declaration of Ruth C. Pinkel and exhibits thereto, the government's objections to the Presentence Report filed on March 17, 2017 (CR Dkt. 132), the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 26, 2017          Respectfully submitted,

                               SANDRA R. BROWN
                               Acting United States Attorney

                               LAWRENCE S. MIDDLETON
                               Assistant United States Attorney
                               Chief, Criminal Division


                                     /s/
                               _____
                               RUTH C. PINKEL
                               POONAM G. KUMAR
                               SCOTT PAETTY
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

II.   FACTUAL BACKGROUND............................................2

      A.   Fronting of Delinquent Car Payments (Counts 1, 2, 4,
           5, 6).................................................3

      B.   Double-Pledging of Collateral (Counts 18, 19, 20, 22,
           25-27, 29, 31, 32, 33-40).............................4

      C.   Employee Loan Investment Program (Counts 41, 49, and
           50)...................................................5

      D.   Other Parts of Defendant's Fraudulent Scheme..........5

      E.   Impact of Defendant's Fraud...........................5

      F.   Defendant's Flight and Arrest.........................6

III.  GUIDELINE CALCULATION UNDER THE 1987 SENTENCING GUIDELINES.....7

      A.   Background on Government's Position on Calculations.......7

      B.   Defendant Should Not Receive a Two-Level Reduction for
           Acceptance of Responsibility..........................8

      C.   Defendant Should Receive an Upward Departure of Four
           Levels for a Fraud Loss Which "Substantially Exceeds"
           $5 million............................................9

IV.   A CUSTODIAL SENTENCE OF 121 MONTHS IS JUSTIFIED AND
      APPROPRIATE..................................................10

           1.   Nature and Circumstances of the Offense...........11

           2.   History and Characteristics of Defendant..........15

           3.   Need for Deterrence and Need to Protect the
                Public...........................................17

           4.   Need to Avoid Unwarranted Sentencing Disparities....17

V.    RESTITUTION..................................................18

VI.   CONCLUSION...................................................19

# TABLE OF AUTHORITIES

**CASES**

<u>Peugh v. United States</u>,
     133 S.Ct. 2072 (2013)........................................14

<u>United States v. Vargas</u>,
     67 F.3d 823 (9th Cir. 1995)................................10

**STATUTES**

18 U.S.C. § 3181...............................................13

18 U.S.C. § 3553...................................2, 11, 15, 17

**OTHER AUTHORITIES**

U.S.S.G. § 2F1.1...............................................10

U.S.S.G. § 3E1.1..............................................8, 9

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On February 16, 1994, defendant Eminiano "Jun" Reodica ("defendant") was indicted on 51 counts of bank fraud and making false statements to a bank, in violation of 18 U.S.C. §§ 1344, 1014. These charges stem from defendant's orchestration of a scheme to defraud at least five federally-insured financial institutions while running the second largest Chevrolet dealership in the United States. Defendant, who fled the United States in August of 1988, was arrested at Los Angeles International Airport ("LAX") on November 27, 2012. On October 5, 2015, the day before trial, defendant pleaded guilty to the 26 remaining counts of the indictment.[1]  The parties did not enter into a plea agreement. Following his change of plea, defendant filed a motion to withdraw his guilty plea, which was denied by this Court on January 19, 2017. (CR Dkt. 165.)

As set forth below, the government submits that a sentence of 121 months of imprisonment [2] to be followed by a three-year term of

---

[1] On September 18, 2015, the government submitted a redacted trial indictment (CR Dkt. No. 95) setting forth the 26 counts on which it intended to proceed at trial.  Counts Thirteen through Seventeen of the original indictment related to the falsification of TRW credit reports directed by defendant.  Due to the passage of time, the government was unable to find a custodian of record for the true and unadulterated TRW credit reports.  Given this and defendant's refusal to stipulate to the admission of any exhibits, the government elected not to proceed on those counts.

[2] Given that the applicable statutory maximum for violations of 18 U.S.C. § 1344 was five years of imprisonment and for 18 U.S.C. § 1014 was two years of imprisonment at the time of the offense conduct, the government respectfully recommends the sentence be allocated as follows:  five years of imprisonment on Counts 1 and 2 and one month of imprisonment on Count 18, the sentences on Counts 1, 2, and 18 to run consecutively.  On each of Counts 19, 20, 22, 31-32, and 41, a sentence of two years and on each of counts 4-6, 25-27, 29, 33-40, 49-50, a sentence of one year, all to run concurrently to the sentences imposed on Counts 1, 2, and 18.

supervised release, and a fine of $10,000 is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).  The custodial sentence recommendation is at the high-end of the sentencing guideline range with a nine-level upward variance, comprised of: (1) a four-level upward variance for the loss; (2) a three-level upward variance for the nature and circumstances of the offense, including defendant's flight from prosecution; and (3) a two-level upward variance for the history and characteristics of defendant.  As set forth further below, the government submits such a variance is appropriate to account for: (1) the substantial loss caused by defendant's conduct; (2) the nature and circumstances of the offense, including defendant's decades long flight from prosecution; and (3) defendant's history and characteristics, including his pattern of fraudulent behavior.

## II.    FACTUAL BACKGROUND

During the 1980s, defendant was the owner, principal shareholder, president and chief operating officer of the Grand Wilshire Group of Companies ("GWG"). (PSR ¶ 8.)  GWG was primarily engaged in the retail sale and financing of cars and operated two car dealerships and three finance companies. (Id.)  Over time, GWG became the second largest Chevrolet dealership in the United States and the third largest car dealership in the United States. (Declaration of Ruth C. Pinkel ("Pinkel Decl."), Ex. A.)  Due to the apparent success of GWG, Governor Deukmejian appointed defendant to the board of the California Department of Motor Vehicles ("DMV") and later ousted him from the board when his fraud was discovered.[3]

---

[3] See http://articles.latimes.com/1988-08-23/news/mn-680_1_board-members (last visited February 16, 2017).

1    GWG, through its finance companies, obtained numerous lines of

2    credit from financial institutions, including Union Bank, First Los

3    Angeles Bank, Dai-Ichi Kangyo Bank of California, Manilabank

4    California, First Central Bank, Philadelphia National Bank, and

5    Imperial Savings Association ("Imperial"). (PSR ¶ 9.)  Under the

6    terms of GWG's credit agreements with the financial institutions, GWG

7    pledged car contracts as collateral on the lines of credit. (PSR

8    ¶ 10.)  Under this arrangement, GWG was required to collect car loan

9    payments from its customers and provide those funds to the financial

10   institutions. (Id.)  GWG was also required to notify the financial

11   institutions if a customer was delinquent and if a customer became

12   delinquent, that car contract could no longer be used as collateral.

13   (Id.)

14       Defendant's scheme to defraud manifested in three principal

15   ways: (1) the fronting of delinquent car payments; (2) the double-

16   pledging of collateral; and (3) the Employee Loan Investment Program

17   ("ELIP").

18   **A.   Fronting of Delinquent Car Payments (Counts 1, 2, 4, 5, 6)**

19       Defendant instructed his employees to use GWG funds to front

20   payments on behalf of customers who had become delinquent on their

21   payments. (PSR ¶ 12.)  By fronting the payments, defendant was able

22   to conceal the true rate of delinquency and continue to use those

23   contracts as collateral on the lines of credit. (PSR ¶¶ 10, 12-13.)

24   Defendant instructed employees to prepare a monthly "Preliminary

25   Delinquency Report" which identified any delinquent contracts. (PSR

26   ¶ 15.)  When the delinquency rate exceeded the level determined to be

27   acceptable by the financial institutions, defendant instructed his

28   employees to front the payments. (Id.)  GWG employees, at the

3

direction of defendant, also falsified Aging Reports,[4] which were
submitted to the lenders, by misrepresenting the amount of payments
made by the customers and concealing the number of delinquent
contracts.

In pleading guilty to Counts One and Two, defendant admitted
that he executed his scheme to defraud Union Bank and Imperial by
causing the fronting of forty-six delinquent payments to Union Bank
and Imperial between April 10, 1987 and June 27, 1988. (PSR ¶ 14.)
In pleading guilty to Counts Four through Six, defendant admitted to
submitting to Imperial false Aging Reports in May, June, and July
1988, each of which concealed delinquent payments by customers under
contracts pledged to Imperial as collateral on its line of credit.
(PSR ¶ 16.)

**B.    Double-Pledging of Collateral (Counts 18, 19, 20, 22, 25-
27, 29, 31, 32, 33-40)**

Defendant also caused his employees to pledge the same car
contract to two different lenders. (PSR ¶ 17.)  GWG would repossess
cars from customers who were delinquent, but would fail to disclose
to the lenders that the repossession had occurred. (Id.)  GWG would
then re-sell those vehicles and assign the new car contract to the
new lender, without any notification to the original lender. (Id.)

In pleading guilty to Counts 18-20, 22, 25, 27, 29, 31, 32, 33-
40, defendant admitted to executing his scheme to defraud as to
Manilabank, Union Bank, Imperial, First Central Bank, and First Los
Angeles Bank, by pledging car contracts already pledged to those
financial institutions to other lenders. (PSR ¶ 18.)

---

[4] An "aging report" was a report that showed the payment
schedule for a car loan.

4

C.    **Employee Loan Investment Program (Counts 41, 49, and 50)**

In yet another manifestation of defendant's scheme, defendant directed his employees to participate in ELIP in which they signed for a car loan, but did not take possession of the car. (PSR ¶¶ 25, 27.) The loan proceeds would then be used as operating capital for GWG. (Id.) When an employee did not qualify for a loan, defendant and others caused false information regarding the employee's income and credit worthiness to be included in the loan applications. (PSR ¶ 26.)

In pleading guilty to Counts 41, 49, and 50, defendant admitted to executing this scheme against Union Bank when he caused false loan applications to be submitted for GWG employees Ingrid Baysa and Marilou Ramos. (PSR ¶¶ 29-30.)

D.    **Other Parts of Defendant's Fraudulent Scheme**

While not charged in the indictment, defendant executed a number of other fraudulent schemes, including: (1) a credit card investment program through which employees applied for credit cards and then obtained cash advances to fund GWG operating capital; (2) the submission of falsified credit reports to lenders for customers; and (3) the Commercial Paper Program, in which defendant solicited funds from investors in exchange for GWG stock. (PSR ¶¶ 3-32.)

E.    **Impact of Defendant's Fraud**

In the wake of the discovery of defendant's fraudulent conduct, five GWG entities filed for bankruptcy in 1988. (PSR ¶ 33.) Due in part to defendant's conduct, Imperial later failed and was taken over by the Resolution Trust Corporation, which was later succeeded by the FDIC. (Pinkel Decl., Ex. B.) During the course of the bankruptcy, hundreds of investors and numerous financial institutions filed

5

claims. (PSR ¶ 33.)  As set forth in its objections to the PSR, the government provided to the United States Probation Office ("USPO") and produced to the defense, spreadsheets containing a summary of the financial institution and investor claims. (CR Dkt. 132.)  The government also produced all of the bankruptcy records underlying those spreadsheets.[5] (Id.)  In total, these spreadsheets demonstrate a loss amount of at least $90,158,550.26 ($64,246,964.53 in bank claims and $25,911,585.73 in investor claims). (PSR ¶ 33.)  For the reasons set forth in the Government's Objections to the PSR, the government submits this is a very conservative estimate of the loss. (CR Dkt. No. 132.)  Indeed, the FDIC submitted a Victim Impact Statement setting forth that the loss experienced by Imperial attributable to defendant's conduct and explained in detail that the loss exceed $33.5 million.[6] (Ex. B.)

In addition to the tremendous financial loss caused by defendant, defendant caused his employees to lose their jobs.  In addition, several of them were prosecuted for their involvement in the scheme. (See Pinkel Decl. Exs. C-D.)

**F.    Defendant's Flight and Arrest**

While his companies declared bankruptcy and his employees were being investigated for fraud, defendant fled the country and by 1990

---

[5] The government has not submitted the underlying data to the Court, but makes it available to the extent the Court seeks to review it.  Two samples of the underlying data were attached to the government's objections to the PSR.

[6] The claim filed by the RTC (the predecessor of the FDIC) was over $67 million, however the settlement agreement called for a recovery amount of $33.5 million.  (Pinkel Decl., Ex. B.)  Based on the parties' settlement, the government submits it is appropriate for the Court to consider the loss to Imperial to be $33.5 million. (Id.) The restitution for the FDIC, however, should be set at $29,731,447, since the FDIC was able to recover a portion of its loss.

had moved to Australia. (CR Dkt. 16, 16-1, 16-2 and 16-4.)  Before
fleeing, he transferred at least $500,000 to the Philippines, wrote a
$250,000 check and transferred millions more in assets to his then-
wife, and signed a marital termination agreement that absolved his
then-wife of the debts and liabilities resulting from the failure of
GWG. (Pinkel Decl. Exs. E, F, and G.)  Defendant was arrested twenty-
four years later on November 27, 2012, during a layover at Los
Angeles International Airport while traveling under an assumed
identity, Roberto Coscoluella. (PSR ¶ 34.)

**III. GUIDELINE CALCULATION UNDER THE 1987 SENTENCING GUIDELINES**

    **A.    Background on Government's Position on Calculations**

On March 3, 2016, the USPO issued its Presentence Report
("PSR").  Using the 1987 version of the Sentencing Guidelines, the
USPO calculated the base offense level as 6 and applied an 11-level
enhancement for loss exceeding $5 million, a two-level enhancement
since the offense involved more than minimal planning as well as a
scheme to defraud more than one victim, and a four-level enhancement
for aggravating role.  This calculation resulted in an adjusted
offense level of 23. (PSR ¶¶ 41-48.)  The USPO then deducted two
levels for acceptance of responsibility and calculated a total
offense level of 21. (PSR ¶ 54-55.)  Since defendant's known criminal
history category is I, the PSR calculated the guideline range to be
37 to 46 months of imprisonment.  (PSR ¶¶ 60, 77.)

The government filed its Objections to the PSR on March 17,
2016.  As set forth therein, the government objected to the following
portions of the PSR: (1) its application of a two-level reduction for
acceptance of responsibility; (2) its failure to find a loss of
approximately $90,000,000; and (3) its determination that restitution

need not be ordered due to the age of the case and pursuant to 18 U.S.C. § 3663(d). (CR Dkt. 132.) Defendant did not file any objections to the PSR. The USPO has not yet issued an Addendum to the PSR.

The government respectfully refers the Court to its Objections to the PSR filed on March 17, 2016 (CR Dkt. 132) for more detail on these objections and supplements these objections with its arguments in Sections B and C below.

**B.    Defendant Should Not Receive a Two-Level Reduction for Acceptance of Responsibility**

As the government set forth in its objections, the simple fact of defendant's guilty pleas, which came the day before trial, does not "entitle[] [defendant] to a sentencing reduction under this section as a matter of right." U.S.S.G. § 3E1.1(c). Indeed, a defendant is entitled to acceptance of responsibility only if he "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for the offense of conviction." U.S.S.G. § 3E1.1(a).

In making this determination, the Court may consider a number of factors, including defendant's voluntary termination or withdrawal from criminal conduct, voluntary and truthful admission to authorities of involvement in the offense and related conduct, voluntary surrender to authorities promptly after commission of the offense, and timeliness of defendant's conduct in manifesting acceptance of responsibility. U.S.S.G. § 3E1.1 app. note 1 (a), (c), (d) and (g) (1987). Defendant's flight while his companies collapsed around him stands in stark contrast to a clear demonstration of acceptance of personal responsibility. The only exception to

8

defendant's over three decades of evasion of his responsibility was

his guilty pleas.  However, even that was relatively short-lived

because after the government filed its objections to the PSR,

defendant sought to withdraw his guilty pleas, which this Court

denied on January 19, 2017.

Defendant's myriad claims rejecting his personal responsibility

included contentions that (1) "the indictment and charges should be

considered civil cases rather than criminal as they pertain to

business contracts in the ordinary course of doing business";

(2) "the constitutional protection of individual rights to conduct

business within the framework of ordinary course of doing business

should not be interfered with by the [government]"; (3) the

indictment somehow resulted from "racial discrimination"; and (4) he

was ill and in distress and did not mean to plead guilty. (CR Dkt.

135.)

Defendant's pattern of behavior both before and after his guilty

plea flatly contradicts any claim of acceptance of responsibility and

the government submits that no such adjustment is appropriate.

### C.    Defendant Should Receive an Upward Departure of Four Levels for a Fraud Loss Which "Substantially Exceeds" $5 million

The government requests an upward departure of four levels for

loss because, by any calculation, the loss caused by defendant's

crimes "substantially exceeds" the $5 million high-end of the 1987

fraud loss guidelines.  U.S.S.G. § 2F1.1, app. note 10 (1987) ("The

adjustments for loss do not distinguish frauds involving losses

greater than $5,000,000.  Departure above the applicable guideline

may be warranted if the loss substantially exceeds that amount.").

Even without adjusting for inflation, defendant caused astronomical

9

financial losses by 1980s standards.  Whether the Court finds a conservative loss of $33.5 million for the FDIC loss, alone, or $90 million as set forth in the summary chart attached to the Government's Objection, the loss here substantially exceeds $5 million.

In a case involving this same application note, the Ninth Circuit affirmed a district's sentence and found reasonable the court's imposition of one-level upward departure for each $5 million increment of loss exceeding $5 million.  United States v. Vargas, 67 F.3d 823, 825 (9th Cir. 1995) (four-level upward departure for $20 million fraud loss under U.S.S.G. 2F1.1, app. Note 10 (1987)).  Here, since the conservative loss figure of $33.5 million is six times higher than the applicable guidelines contemplated and the actual loss of $90 million is eighteen times higher, this Court could reasonably depart upward six to 18 levels for loss.  Given the substantial losses caused by defendant, the government's requested upward departure of four levels is both reasonable and warranted under application note 10.

**IV.  A CUSTODIAL SENTENCE OF 121 MONTHS IS JUSTIFIED AND APPROPRIATE**

The government's recommendation of 121 months of imprisonment is appropriate and justified in light of the factors set forth under 18 U.S.C. § 3553 (a), namely, the nature and circumstances of the offense, the history and characteristics of defendant, the need for the sentence to reflect the seriousness of the offense and to afford adequate deterrence to criminal conduct, and the need to avoid unwarranted sentencing disparities.

1              1.   <u>Nature and Circumstances of the Offense</u>

2      The nature and circumstances of the offense are serious,

3 egregious, and justify the requested upward variance. <u>See</u> 18 U.S.C.

4 § 3553 (a)(1). Defendant was the mastermind of a far-reaching scheme

5 to keep millions of dollars in credit from federally-insured banks

6 open to GWG and its affiliated companies. As discussed above,

7 defendant was the founder and undisputed leader of GWG, a large and

8 multi-faceted set of companies. Defendant was intimately involved in

9 the strategic growth and business approach of the company he built.

10 Simply put, defendant was GWG. Defendants' employees looked up to

11 him, followed his orders, and took pride in the GWG's success.

12 Defendant's fraud had a significant impact on the banks that

13 defendant depended on and on the people who worked for him.

14 Defendant kept GWG afloat based on the relationships that defendant

15 developed with many Southern California banks, including the banks

16 listed as victims in the indictment: Union Bank, Imperial Savings,

17 First Los Angeles Bank, Manilabank, and First Central Bank. However,

18 these relationships were based on defendant's fraud.

19      The scale of the fraud is virtually unparalleled. As set forth

20 above, the financial institutions that defendant preyed upon suffered

21 losses in excess of $64.2 million. Notably, Imperial subsequently

22 failed and went into receivership with the FDIC based on the losses

23 sustained as the result of defendant's fraud. Imperial's loss is

24 further described in the victim impact statement attached as Exhibit

25 B.

26      In addition to the financial institutions, individual investors,

27 who primarily consisted of members of the Filipino community in Los

28 Angeles, trusted defendant with their money, the vast majority of

1    which was lost following the bankruptcy.  In total, the investors

2    sustained an additional $24.9 million in losses.  As set forth above,

3    the scale of the fraud alone justifies a significant upward variance.

4         The human cost due to defendant's fraud was likewise

5    significant.  For example, the GWG employees who personally signed

6    for car loans in the ELIP and never made payments on the cars, took

7    substantial hits to their credit reports that took years to correct

8    when the loans failed.  Defendant's employees lost their jobs when

9    GWG declared bankruptcy and defendant fled.  Further, dozens of

10   defendant's employees faced questioning by law enforcement and at

11   least nine GWG employees were criminally charged as a result of their

12   involvement in defendant's fraud.  The sentences for these

13   individuals ranged from probation, for defendant's secretary, to a

14   sentence of five and one-half years in custody, plus five years of

15   probation, for defendant's Chief Financial Officer. (See Exs. C, D.)

16   Moreover, when defendant was arrested at LAX, those cooperators came

17   forward and prepared to testify against defendant at trial, even

18   though they had served their sentences.  The government witnessed

19   firsthand the emotional turmoil discussing these difficult times

20   brought to each of these defendants.

21        Defendant compounded the seriousness of his crimes by his

22   decision to flee the United States, leaving a crumbling empire and

23   the associated fallout in his wake.  While the potential bankruptcies

24   of his various GWG entities were still being explored, defendant

25   wired $500,000 from a Grand Chevrolet bank account to an account in

26   the Philippines, wrote a check for $250,000 to his then-wife from a

27   Grand Chevrolet account, and left the United States for the

28   Philippines. (Pinkel Decl. Exs. E, F, G.)  Shortly before his flight

from the United States, defendant told witnesses that he had
committed a crime and he was concerned about criminal charges. (CR
Dkt. 61 and 64, Declaration of Ruth C. Pinkel, Exs 4 and 8.)
Defendant fled to the Philippines which, at the time, did not then
have an extradition treaty with the United States.  18 U.S.C. § 3181
(indicating that extradition treaty was effective November 22, 1996).
Defendant was never seen again at his businesses and remained a
fugitive while his employees were prosecuted.

When defendant was arrested at LAX in the early morning hours of
November 27, 2012, defendant was traveling as an Australian citizen
under an assumed name, Roberto Coscolluela, with his new wife and
stepdaughter. (CR Dkt. 56, Declaration of Eminiano Reodica.)  When
questioned by FBI agents at the airport, defendant repeatedly stated
his name was Roberto Coscolluela while holding up his Australian
passport in the same name. (CR Dkt. 63, Declaration of Dana Eads.)
Defendant denied ever living in the United States or having any
family or friends here.  Defendant's flight and assumption of a new
identity evince a willful desire to evade detection and
responsibility for his crime that render his actions even more
egregious. (Id.)

To illustrate the seriousness of defendant's offenses, the
government directs the Court to the calculation of defendant's
offense level under the current version of the Guidelines.  While the
government recognizes that the 1987 Sentencing Guidelines apply to
defendant's case and the 2016 version decidedly does not due to *Ex
Post Facto* Clause concerns, the Supreme Court has found that a
sentencing court may nonetheless consider the current version of the
guidelines "as representing the most recent views of the agency

13

charged by Congress with developing sentencing policy." <u>Peugh v.
United States</u>, 133 S.Ct. 2072, 2087 (2013).  Following <u>Peugh</u>'s
guidance, the government submits that a review of the current
Guideline calculation underscores the seriousness of defendant's
crimes and offers "one of many reasons" the district court may
upwardly vary from the applicable guidelines:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1][7] |
| Loss more than $65,000,000 And less than $150,000,000 | +24 | [U.S.S.G. § 2B1.1(b)(1)] |
| Involved more than 250 victims: | +6 | [U.S.S.G. § 2B1.1(b)(2)] |
| Jeopardized the soundness of financial institution: | +2 | [U.S.S.G. § 2B1.1(b)(16)(b)][8] |
| Sophisticated Means: | +2 | [U.S.S.G. § 2B1.1(b)(20)(C)] |
| Aggravating Role: | +4 | [U.S.S.G. § 2B1.1(a)] |
| Abuse of Position of Trust or Use of Special Skill: | +2 | [U.S.S.G. § 3B1.3] |

**Total Offense Level              46**

For criminal history category I, this results in a sentencing
range of life (regardless of whether defendant is accorded acceptance
of responsibility).

The government submits that the seriousness of defendant's
offense, including his flight from prosecution, justify an additional
three-level upward variance.

---

[7] The statutory maximum for bank fraud (18 U.S.C. § 1344) is
currently 30 years.  However, in 1988, it was 5 years.  As such, the
government has applied a base offense level of 6.

[8] Based on U.S.S.G. § 2B1.1(b)(16)(C), the government has
applied only +2 to make the sum of enhancements 8, rather than the 4
called for by (b)(16)(B).

2.    <u>History and Characteristics of Defendant</u>

Defendant's history and characteristics also justify a significant term of imprisonment in this case and a two-level upward variance.  <u>See</u> 18 U.S.C. § 3553 (a)(1).  Defendant is by any measure a person with substantial gifts.  He exhibited keen business and marketing skills as he built Grand Wilshire Chevrolet from a single storefront to the third largest car dealership in the United States with a profitable set of automobile sales and financing entities that spanned approximately 25 retail locations throughout California. However, defendant has exhibited a troubling predilection to using these skills to engage in criminal conduct.  Defendant utilized accounting expertise and experience gained as a board member of the California Department of Motor Vehicles to conceive of concealment methods for the fraud.  Defendant used his leadership qualities to victimize his workforce in furtherance of his theft (<u>e.g.</u>, requiring employees of his companies to falsely apply for car loans while using the proceeds for operating capital and leaving the employees to face negative consequences on their individual credit reports).  Defendant used his charisma and standing in the Filipino community to recruit hundreds of investors for his Commercial Paper Program, which lined his own pockets but left investors with nothing.

After defendant's arrest in Los Angeles, the government discovered that defendant, while using his alias Roberto Coscolluela and while on the run from the federal charges brought here in this district, continued to defraud unwitting victims in Australia. (Pinkel Decl. Exs. H, I.)  In addition to various civil fraud cases, there are criminal investigations pending against defendant in

Australia where he has been dubbed "Brisbane's Bernie Madoff".[9]
These cases involve allegations that defendant defrauded his tax
preparation, insurance, and business customers in myriad ways,
including by embezzling their tax refunds and defrauding them out of
money he allegedly invested on their behalf in an apparent Ponzi
scheme.[10]   The losses from these new schemes are purportedly $7
million and involve approximately 27 victims.  (Pinkel Decl, Exs. I
at bates 1764-65.)  These civil suits and criminal investigations
were known to defendant at the time he left Australia on his way to
Canada.  Defendant's perpetuation of a fraud in Australia while on
the run from his fraud here serves to emphasize defendant's history
for dishonesty and blatant disregard of the law.  This extensive
fraud also demonstrates that defendant's criminal history is
understated.

        Defendant will undoubtedly point to his age and medical
conditions as mitigating circumstances necessitating leniency here.
However, the government notes that defendant's older age and medical
circumstances are the product of his own actions.  Defendant fled
criminal prosecution for 24 years.  Had he accepted responsibility in
1988, his age would not have been a factor justifying leniency.
Defendant should not benefit from his flight.

        The government submits that defendant's history and
characteristics justify a two-level upward variance.

_____

        [9] *See* http://www.theaustralian.com.au/news/latest-
news/brisbanes-bernie-madoff-pleads-guilty/news-
story/e88dcf6287947f1c7bed6e04590ae16e.

        [10] Defendant's lulling email exchange with a particular victim is
communication typical of a Ponzi scheme perpetrator.  (Pinkel Decl.,
Exs I at bates 1660-1689.)

16

3.    <u>Need for Deterrence and Need to Protect the Public</u>

The government's recommended sentence affords adequate deterrence and protects the public from further crimes of defendant. <u>See</u> 18 U.S.C. § 3553 (a)(2).  A significant custodial sentence is warranted for both general and specific deterrence.  Fraudulent schemes that result in large-scale losses are destructive to society and a strong deterrent message is necessary, particularly when the size and scope of this fraudulent scheme is considered.  Furthermore, a significant sentence of imprisonment will emphasize that fleeing from prosecution comes at a great cost.

Regarding specific deterrence, defendant has spent a lifetime moving from one fraudulent scheme to the next and the government has significant recidivism concerns.  Moreover, defendant has not expressed remorse for the damage he caused and has actually taken as many steps as possible to avoid responsibility for his actions. Indeed, he has claimed that the instant case is not deserving of criminal charges at all.  Furthermore, even while trying to avoid responsibility for his actions here in the United States, he committed additional fraud in Australia.  While defendant is older, the government nonetheless has concerns of recidivism.  A significant term of imprisonment is warranted to deter defendant from engaging in future criminal conduct and to protect the public from further crimes of defendant.

4.    <u>Need to Avoid Unwarranted Sentencing Disparities</u>

The government's recommended sentence also prevents unwarranted disparities among defendants who have been found guilty of similar conduct.  As discussed above, and shown in detail in Exhibits C and D, the other GWG defendants were given sentences ranging from

17

probation to five and a half years for defendant's CFO, who (unlike
defendant) accepted responsibility immediately, cooperated with
investigators, and pled guilty in 1990.  Indeed, notwithstanding that
they had served their sentences, many of these cooperators were
prepared to testify against defendant at trial.  Defendant's conduct
was more culpable than any of his co-defendants because he was the
leader and organizer of the fraudulent schemes; to be clear, the
government does not believe the fraud would have occurred at all had
it not been for defendant.  Furthermore, he fled the United States
leaving his employees behind to deal with his crumbling empire and
law enforcement scrutiny,[11] and he refused to accept responsibility
for his actions, even attempting to withdraw his guilty plea.
Defendant should receive a sentence that far exceeds those given to
his employees.

**V.    RESTITUTION**

     As set forth in its objections to the PSR, the government
objects to the PSR's conclusion that no restitution order is
necessary.  In contrast, the government believes restitution is
essential in this case and can be given in accordance with the
exhibits attached to the objections to the PSR.  As set forth in the
objections to the PSR, the government submits restitution is
appropriate for both the bank and investor claims.  (CR Dkt. 132,
Exs. A and B.)  At a minimum, a restitution order in favor of the
FDIC of $29,731,447 is appropriate, given the time and effort

_____

     [11] To a certain extent, these cooperators were victimized by
defendant multiple times: (1) in the patriarchal 1980s GWG culture
where they were told to follow defendant's orders to commit crimes;
(2) when defendant fled the U.S. and left them holding the bag; and
(3) when defendant was caught in 2012 and forced them to relive the
shame and embarrassment of their criminal conduct.

expended by the FDIC to reconstruct the losses they suffered at the hand of defendant nearly thirty years ago. (Pinkel Decl. Ex. A.)  Not entering a restitution order in this case would serve only to reward defendant's flight even though the effects of his fraud are undoubtedly still being felt.

**VI.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose an order of restitution on defendant and upwardly vary by nine levels and sentence defendant to the high-end of the resulting Guideline Range, specifically, a sentence of 121 months in custody to be followed by a three-year term of supervised release and a fine of $10,000.

1

<u>DECLARATION OF RUTH C. PINKEL</u>

2

I, Ruth C. Pinkel, declare as follows:

3       1.   I am an Assistant U.S. Attorney for the Central District of

4  California.   I was assigned to represent the government in the case

5  of <u>United States v. Reodica</u>, CR 94-121-SJO in December 2012 and have

6  done so continuously since then.   I have knowledge of the facts set

7  forth herein and could and would testify to those facts fully and

8  truthfully if called and sworn as a witness.

9       2.   Attached hereto as Exhibit A is a true and correct copy of

10 a Press Release issued by the U.S. Attorney's Office on January 24,

11 1991, bates numbered USAO 1584-1586.

12      3.   Attached hereto as Exhibit B is a true and correct copy of

13 victim impact statement submitted by the Federal Deposit Insurance

14 Corporation, bates numbered 013953-13955.

15      4.   Attached hereto as Exhibit C is a true and correct copy of

16 a chart setting forth the sentences received by defendant's

17 employees.

18      5.   Attached hereto as Exhibit D are true and correct copies of

19 the judgment and commitment orders entered in the cases of

20 defendant's employees.

21      6.   Attached hereto as Exhibit E are true and correct copies of

22 funds transfer requests forms signed by defendant dated July 25 and

23 26, 1988, which were produced to defendant on November 14, 2014 as

24 Exhibits 16 and 17.

25      7.   Attached hereto as Exhibit F are true and correct copies of

26 documents related to defendant's divorce in 1988, bates-numbered

27 13842-13883.

28

8.    Attached hereto as Exhibit G is a true and correct copy of a check in the amount of $250,000 written to defendant's then-wife signed by defendant in August 1988, which was produced to defendant on November 14, 2014.

9.    Attached hereto as Exhibit H are true and correct copies of FBI 302 reports related to defendant's Australian fraud, bates numbered 1635-39.

10.    Attached hereto as Exhibit I are true and correct copies of representative witness statements, within the bates number range 1640 to 1848, related to defendant's Australian fraud provided to the government by Australian law enforcement and Australian attorney Carl Desacola.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, April 25, 2017.

/S/ *Ruth C. Pinkel*

RUTH C. Pinkel

21