JOHN NEIL McNICHOLAS, ESQ.
CA Bar No.: 138304
McNICHOLAS LAW OFFICE
464 Palos Verdes Blvd.
Redondo Beach, CA 90277
(310) 545-0780
(310) 546-6831- FAX
john@mcnicholaslawoffice.com
Attorney for Defendant,
EMINIANO REODICA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 94-121-SJO |
| Plaintiff, | |
| vs. | **DEFENDANT EMINIANO REODICA'S SENTENCING MEMORANDUM** |
| EMINIANO REODICA, | |
| Defendant. | Date: May15, 2017 |
| | Time: 9:00 a.m. |

Defendant, EMINIANO REODICA ("Reodica"), by and through his attorney, JOHN NEIL McNICHOLAS, hereby submits his sentencing memorandum. This sentencing memorandum is intended to assist in formulating a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 25 S. Ct. 738 (2005).

DATED: May 1, 2017                    /s/
                              JOHN NEIL McNICHOLAS, Attorney
                              for EMINIANO REODICA

# **TABLE OF CONTENTS**.

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

II.  EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III. OBJECTIONS AND CORRECTIONS TO PRESENTENCE REPORT . . . . . . . . . .   3

    A.  Government Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

    B. Reodica's Position  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

IV. HISTORY AND LIFE OF EMINIANO "JUN" REODICA . . . . . . . . . . . . . . . . .   4

    A. Family, Education  and Business History . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    B.  Community and Governmental Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

    C. Reodica's Return to the Philippines and Relocation to Australia . . . . . . . . . . . . .   8

    D.  Reodica Demonstrated Exemplary Post Arrest Conduct . . . . . . . . . . . . . . . . . .   9

    E.  Reodica Has Suffered From Health Problems Since the 1980's . . . . . . . . . . . . .   10

V.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

    A.  The Presentence Report Accurately Assesses The Guideline Loss Calculation under

    U.S.S.C. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

    B.  Acceptance of Responsibility: a 2-level Reduction Is Justified . . . . . . . . . . . . . .   13

    C.  Mr. Reodica Suffers from a Myriad of Serious Medical Conditions That Support a

    Substantial Variance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

    D. Mr. Reodica Is 72-years Old and Has No Criminal History . . . . . . . . . . . . . . . .   14

    E.   Reodica  Engaged in Exceptional Charitable and Community Activities . . . . . . .   15

    F. Restitution Cannot be Justified in This Case . . . . . . . . . . . . . . . . . . . . . . . . . .   17

    G.  Post-Arrest Rehabilitation Justifies a Variance  . . . . . . . . . . . . . . . . . . . . . . . .   19

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

i

1

2

## **TABLE OF AUTHORITIES**

**Federal Cases**

*United States v. Autery,* 555 F.3d 864 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*United States  v. Bennett,* 9 F.Supp.2d 513 (E.D.Pa. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Booker,* 543 U.S. 220,  25 S. Ct. 738 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*United States  v. Canoy,* 38 F.3d 893 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States  v. Crouse,* 145 F.3d 786 (6th Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*United States v. Dhingra,* 371 F.3d 557, 568 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Green,* 152 F.3d 1202 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Hein,* 463 F.Supp.2d 940 (E.D. Wisc. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States  v. Jones,* 158 F.3d 492 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States  v. McFarlin,* 535 F.3d 808 (8th Cir. 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Paul,* 561 F.3d 970 (9th Cir. 2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Ramos-Medina,* 706 F.3d  932,  940 (9th Cir.), as amended, *cert. denied,* 134 S.Ct. 64

(2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Rausch,* 570 F. Supp. 2d 1295 (D. Colo. 2008). . . . . . . . . . . . . . . . . . . . . .  14

*United States v. Rioux,* 97 F.3d 648 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Serafini,* 233 F.3d 758 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Vargas,* 67 F.3d 823 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States  v. Wilke,* 995 F.Supp. 828 (N. D. Ill. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States  v. Wilke,* 156 F.3d 749 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States  v. Woods,* 159 F.3d 1132 (8th Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Zuniga,* 66 F.3d 225, 228 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Federal Statutes**

18 U.S.C. § 1014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

18 U.S.C. §1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

18 U.S.C. § 3553 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 2, 15

1

2

**<u>United States Sentencing Guidelines</u>**

3  U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

4  U.S.S.G. §3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

5  U.S.S.G.§ 5H1.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

6  U.S.S.G. § 5H1.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

7

**<u>Treatises, News Articles</u>**

8  Brown, *"Wheels of Fortune,"* Washington Post (February 27, 1989) . . . . . . . . . . . . . . . . . . . . . . .  13

9
   *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates,* U.S.
10 Department of Justice, National Institute of Corrections (2004 ed.)  . . . . . . . . . . . . . . . . . . . .  15

11 Suzanne Kearns, 5 Dangers of Overly Fast Small Business Growth Strategies,
   http://www.moneycrashers.com/dangers-fast-small-business-growth-strategies. . . . . . . . . .  13

12
   *Primer on Loss Calculations Under §2Bl.l(b)(l)* at 14-15 (United States Sentencing Commission
13 (June 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

14 Benjamin J. Stein, *On the Junk Heap, The Trashing of a Multi-Billion Dollar California
   Savings and Loan*, Barron's, October 9, 1989 [USA001059-68] . . . . . . . . . . . . . . . . . . . . . . .  18

15 Richard W. Stevenson, *California Saving Unit Is Seized*, NY Times, February 24, 1990  . . . . . .  18

16 Larry Tye,  *California S&L's Fall From Grace Is Classic Case,* Boston Globe, July 22, 1990. . . .  17

17

18

19

20

21

22

23

24

25

26

27

28

## I. INTRODUCTION

Defendant Eminiano Reodica ("Reodica") comes before this Court for sentencing after pleading guilty to 26 counts of the 51-count Indictment in this case, including bank fraud and making false statements in applications for credit [18 U.S.C. §§ 1344, 1014]. These charges arose out of allegations surrounding the Grand Wilshire Group of Companies ("GWG") in the mid to late 1980s. GWG was comprised of a group of businesses engaged in the sale and financing of automobiles, and was headquartered in Glendora, California. Reodica was the CEO of GWG. The Probation Office correctly utilized the 1988 Guideline Manual, and has found that the appropriate Guideline range is 37-46 months. This is based on a loss calculation of greater than $5 million, and a four-level enhancement for being a leader/organizer of the charged scheme. Although the government argues that the loss is substantially higher than $5 million, the Probation Office concludes that any loss greater than $5 million cannot be adequately quantified. Reodica concurs with the reasoning and analysis of the Probation Office.  Considering Reodica's past acts of kindness, generosity, and charity, post arrest conduct, age and failing health, submits that a Guideline sentence between 37 and 46 months is sufficient, but not greater than necessary, to comply with the intent of 18 U.S.C. § 3553(a).

## II. EXHIBITS

1. Letter from Hilda Hilao, former wife;

2. Letter from Emily Rollins, daughter;

3. Letter from Elinore Reodica-Han, daughter;

4. Letter from Remedios Reodica LaSangre, sister;

5. Letter from Rogelio Aquino, friend from Philippines;

6. Letter from Rhoneil Pascual, former employee at Grand Chevrolet;

7. Reodica Paralegal Certificates;

8. Reodica Ordained Minister Certificates;

9. Bruce Li B.O.P. release date information;

10. Australia and M.D.C. Health records (filed separately under seal).

## III. OBJECTIONS AND CORRECTIONS TO PRESENTENCE REPORT

### A.  Government Position

The government seeks a sentence of 121 months imprisonment, which is at the high-end of the Sentencing Guideline range with a nine-level upward variance. The government is asking for  a four-level upward variance for a loss amount which cannot be proven; a three-level upward variance for the nature and circumstances of the offense, including Reodica's flight from prosecution, even though Reodica left the United States five years before he was indicted; and a two-level upward variance for Reodica's history and characteristics, even though the level of respect from his community due to charitable contributions, apart from the crimes, was enormous.  *See Gov't Sent. Position*, 2: 4-14; 19: 10-12.

### B. Reodica's Position

Reodica agrees with the Probation Office that he should be sentenced under the Guidelines with a Total Offense Level of 21, and a Criminal History category of I, resulting in a Guideline range of 37-46 months. Reodica further agrees with the Probation Office that 18 U.S.C. Section 3663(d) is applicable to this case, which states that if the Court determines  that "the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the Court may decline to make such an order." Amended PSR, ¶ 117.

## IV. HISTORY AND LIFE OF EMINIANO "JUN" REODICA

### A. Family, Education and Business History

Eminiano Abrian Reodica, Jr., always known to his friends as "Jun," was born on September 27, 1944 in Pagsanjan, a small town in the Philippines. His father, Eminiano Rivera Reodica, Sr. was a postal worker in the Philippines. Later in life, Reodica, Sr. came to California and worked for several years for his son at Grand Chevrolet. Reodica, Sr. died in Azusa, California in 2015.

Reodica recalls a story told to him by his mother, Lolita Abrian Aquino Reodica: "It was 1945, and the war in the South Pacific was drawing to a close,". "Japanese soldiers stopped my mother and me as we were fleeing our village, and knocked me to the ground. One soldier was ready to spear me with his bayonet when my mother threw herself over me and pleaded for mercy. The soldier walked away." Lolita Reodica was involved in the formation of an elementary school and was also a community leader in the Philippines before she came to the United States to be with her children and grandchildren. She died in Azusa, California in 2007.

Reodica's siblings include his 71-year old brother, Serafin Reodica who currently resides in Azusa, California, his sister, Corazon Reodica, age 61, who also lives in Azusa, his brother, Emmanuel Reodica who is 57 years old and lives in Cordova, Alaska His sister, Remedios Reodica Lasangria, age 49, lives in Las Vegas.

Reodica and his first wife Hilda Roque Hilao met in the Philippines. They married in 1969. They had four children together: Emily Hilao Reodica-Rollins[1], age 47,

---

[1] Emily Rollins is currently a partner at a Big 8 CPA Firm in the State of Washington. Emily Rollins' children include Nathan, who at age 19 is in the Harvard Ph.D. microbiology program; Joshua, age 18, attends the University of Washington and studies electrical engineering embedded in computer engineering. Kirstin, age 16 is a microbiology student at University of Texas, Austin. David, age 16, starts college in 2017. Emily states: "Nathan's brilliance and exuberance for learning always reminds Emily of her father. Joshua promotes Filipino culture through dance performances, is a true testament to my dad's commitment to the Filipino community."

Elinore Hilao Reodica-Han, age 45, Elisa Hilao Reodica-Thompson, age 40, and Jun Hilao Reodica, age 39. Reodica, who never consumed alcohol or controlled substances, always stressed to his children to avoid any use of alcohol, as a habitually counter-productive substance which leads to disease and shortened life span.

Reodica  started working as a guide to foreign sailors visiting his town at age 10. He also served in the Boy Scouts of the Philippines from 1957 - 1961.  Reodica recalls being sexually assaulted by a scoutmaster when he was 13 years old.  As a teen, Reodica participated in a Four H Club public garden project  where he learned about organic vegetable farming. In high school he was elected president of the Pagsanjan Academy student body.

Reodica founded Mu Epsilon Lambda in Manila, an academic and service-oriented  fraternity at the University of the East.  The fraternity is still active, after more than 50 years, with alumni membership including outstanding CPAs, lawyers and business leaders in the Philippines.  In 1965, at the age of 21, Reodica was honored as one of the Top 10 students in the Philippines. That same year, he graduated summa cum laude from the University of the East in Manila with a bachelor of science degree in business administration and accounting. He became a certified public accountant in 1966.

Reodica took a job with Colgate-Palmolive's Philippine subsidiary, and in a few years was promoted to senior product manager. Among other responsibilities, he handled the company's top product, Colgate Dental Cream, which captured a 96-percent share of the toothpaste market. In 1968, with funding from Colgate-Palmolive Philippines Inc, Reodica managed the construction of a mobile dental clinic which provided dental services at the participating elementary schools located in the

rural areas of Southern Luzon, the Philippines where children's dental services are rare and expensive. This project lasted three years.

Reodica and Hilda Roque Hilao , arrived in Chicago in November, 1971. "We had left our children in the Philippines, and I only had $50 in my pocket. I bought suits and ties from the Salvation Army."  General Motors hired Reodica as a showroom greeter-someone who hands out brochures at headquarters.

Soon after, Reodica was accepted into the General Motors Institute in Flint, Michigan for the three year training program, in wholesale and retail management. Additionally, Reodica learned about retail sales, mechanics, body shops, parts and dealership accounting at Lou Grubb Chevrolet in Phoenix, Arizona.  After six months of intense training, he was promoted to district manager in GM's Los Angeles zone, the largest new-car market in the world. Reodica conducted daily meetings on marketing and cost control during the height of the first gasoline shortage in Los Angeles. In his first year, Reodica's district won several GM regional sales contests. Reodica became a naturalized citizen of the United States in 1975.

One dealership Reodica helped while at GM, Terry York Chevrolet, hired him as vice president and general manager. Several of Reodica's long-time friends and trained certified public accountants Ed Coscolluella, Rely Pio Roda and Mel Panlilio, soon joined the management team at Terry York. During their three years at Terry York, Reodica and his associates transformed it into one of the Top 10 Chevy dealerships in the Los Angeles  area (out of 70). Total unit sales soared to 5,000 per year, and dollar sales hit $39 million.

In 1978, Reodica bought his own dealership, and his management team followed him. Despite accusations against him, Reodica never left his modest home in Glendora and drove vehicles from his used car fleet. *See* Exhibit 6, letter from Rhoneil Pascual.

His daughter, Emily Rollins often assisted at the dealership when she was just a teen. She recalls one instance where one of his employees was caught stealing and.  Rather than firing the employee, Reodica asked why he stole, and then forgave him.

### B.  Community and Governmental Service

Reodica was a popular Glendora resident. Former Glendora mayor Larry Glenn, stated that Reodica was a leader in the community and a major contributor in many philanthropic projects. While living in Glendora, Reodica helped unite Filipinos in the Los Angeles area by organizing cultural events, sponsoring numerous not-for-profit organizations, producing a weekly radio program, and publishing a Filipino newspaper. He also used his resources to help Filipino-Americans register to vote so they could exercise their rights as U.S. citizens.

**Philippine General Consulate:** Reodica actively participated in direct assistance to the Filipino Diaspora in the United States and in the Philippines.

**Adopt a Barrio Program:** Together with Ambassador at Large Armando Fernandez, Reodica supported the Adopt a Barrio Program that benefitted the needy farmers and poor people of the Philippines by providing seed capital for their small business endeavors here in the U.S. and abroad

**Confederation of the Philippine-U.S. Organizations**: Reodica served as the Chairman of the First "Santacruzan," a religious and ethnic celebration participated by over 200 Filipino-American organizations.  The officers and members volunteered as the "Sagalas" and "Constantinos" (religious icons and regally attired young escorts) in a solemn Christian procession where over 10,000 persons held battery operated candles along the paths created within the Los Angeles County downtown quadrangle and neighboring streets.

**Commissioner of the L. A. County Tax Appeals Board**: Reodica served as one of the three board members/ commissioners of the Los Angeles County Tax Appeals Board for one year, representing L. A. County Supervisor Pete Schabarum. Reodica became known as a compassionate commissioner, making sure that all property owners' concerns before the L. A. County Tax Appeals Board are well attended to by the County Assessors before making a determination of the homeowners' needs and complaints. His dedication to this job was accentuated when he collapsed due to work exhaustion during one of the hearings for property owners complaining about the exorbitant property tax increases.

Reodica helped a young ophthalmologist  establish his practice by providing all laboratory and examination equipment.  *See* Exhibit 6, letter from Rhoneil Pascual.

Reodica served as a **commissioner for the California State Dept of Motor Vehicles** during the term of Governor George Deukmejian.

**C**. **Reodica's Return to the Philippines and Relocation to Australia**

Shortly after declaring Chapter 11 bankruptcy in 1988, Reodica was faced with many threats upon himself and his family. He decided to return to the Philippines in July, 1988.[2] While in the Philippines, Reodica legally changed his name to Roberto Abrian Coscolluela, Jr. in October, 1988. He and Hilda Hilao divorced in 1988. Also during his return to the Philippines, he met with future Philippine President Fidel Ramos and then-Cardinal Jaime Sin, Archbishop of Manila with the hope of establishing a car dealership in his home country.

---

[2]The government insists that Reodica's leaving the United States in 1988, five years prior to his indictment in this matter, constitutes flight from prosecution, justifying an additional 3-level upward variance. *Gov't Sent Position,* 14: 19-24. The time between his departure and formal charges in this case is too great to make that connection.

When it became clear that Reodica had no foreseeable future in the Philippines, he decided to return to the United States.  Reodica attended a real estate course in Seattle, Washington, where he remained for several months.

In October 1989, Reodica found an opportunity to live and work in Sydney, Australia. He was employed by National Mutual Life Insurance on January 2, 1990 in its Cairns Division under his new name, Roberto Coscolluela. He became an Australian citizen after 2 years.

Reodica married Leticia Sta Ines Coscolluela in 1992. Mrs. Coscolluela is currently  71 years old.  She was Reodica's business partner in Australia . Both Reodica and Coscolluela supported Mrs. Coscolluela's children who currently reside in the Philippines and Australia.

Since 1993, Reodica, operated a finance, insurance and business consulting company.  He remained in Australia and operated his business with his current wife until his arrest at the Los Angeles International Airport in 2012.  He eventually lost his business and all property owned by him and his current wife.  Mrs. Coscolluela lives on her son's farm  in the Philippines.

**D.  Reodica Demonstrated Exemplary Post Arrest Conduct**.

While in custody at the Metropolitan Detention Center, Reodica received certificates in paralegal studies with distinction, practical bankruptcy law and criminal law from Blackstone Career Institute. *See* Exhibit 7 attached hereto. He proudly served as a volunteer paralegal for 150 inmates during his 54 months in custody at the Metropolitan Detention Center.  Reodica also became an ordained minister with the International Christian College and Seminary. He is certified to perform marriages, funerals and baptisms. *See* Exhibit 8.

9

In recent years Reodica has focused his attention on creating and maintaining a model farm with organic crops. He hopes to cultivate his farm with renewable power sources. He has always believed in cooperative ownership which is part of his farm model. He intends to build a non-denominational worship chapel as well.

**E.  Reodica Has Suffered From Health Problems Since the 1980's**.

Unfortunately, Mr. Reodica is in failing health. He underwent prostate surgery and had a suspected heart attack while living in Glendora in the 1980s, and was hospitalized for a week on each occasion.[3] While living in Australia, he was hospitalized at the Gladstone Base Hospital in Gladstone, Queensland, Australia for two weeks for another heart episode.

Medical records show that Reodica was prescribed Lipitor for high blood pressure and Adalat Oros to suppress angina in 2004. While at M.D.C., Reodica continues to take Lipitor and also takes Nifidine to treat his high blood pressure. His enlarged prostate has been a painful and often embarrassing problem while at M.D.C. For that, he takes Doxazosin. Atorvastatin is used for his high cholesterol.  He takes Metroprolol Tartrate to address heart palpitations. In 2016, he was provisionally diagnosed with cataract, retinal edema, and retinal bleeding. M.D.C. records show he is also losing vision, suffers chronic back pain, and is a borderline diabetic. In 2017 Reodica experienced heart palpitations which required medication and relaxation.  Mr. Reodica's serious health  issues justify a variance.[4]

---

[3]Mr. Reodica was hospitalized at St. Vincent Hospital in Los Angeles for his prostate surgery, and at Foothill Presbyterian Hospital in Glendora for his heart episode.

[4] Reodica's relevant medical records from Australia and M.D.C. are filed separately under seal as Exhibit10 to this sentencing memorandum.

## V.  ARGUMENT

### A.  The Presentence Report Accurately Assesses The Guideline Loss Calculation under U.S.S.G. § 2B1.1.

In its objection to the PSR recommending a loss calculation under U.S.S.G. § 2B1.1, the government relies exclusively on the proofs of claim submitted by investors and financial institutions in the bankruptcy of GWG in 1988 to arrive at a purported loss of $90,158,550.26. In its sentencing position paper, the government also states that a conservative loss figure is the FDIC estimate of $33.5 million. *See Gov't Position*, 10:1-5. In the Presentence Report, the Probation Office analyzed the loss under the dictates of § 2B 1.1, and determined that "[a]lthough there are known claims made by the victims during bankruptcy proceedings after Reodica's companies filed bankruptcy, it is not believed that such claims on its face are sufficient to conclude that the instant offense caused that specific claimed amount." Amended PSR, ¶ 38. While the Probation Office concluded that a reasonable approximation of loss would meet the threshold in the Guideline loss table for a loss greater than $5 million-which was the greatest loss enhancement contemplated by the 1988 Guidelines-it was concerned whether the proofs of claim "represent loss arising from the instant offense," and "may also include amounts not directly emanating from the defendant's fraudulent conduct." *Id.* at ¶ 48. Thus, the Probation Office does not recommend an upward departure or variance based on the loss amount. For the reasons set forth by the Probation Office and supplemented below, Reodica joins in the loss calculation recommended by the Probation Office.

In its effort to justify a 4-level increase in the offense level, the government cites *United States v. Vargas*, 67 F.3d 823, 825 (9th Cir. 1995). However, the government bears the burden of proving loss for the purposes of § 2B 1.1 by a preponderance of the

evidence. [5] *United States v. Zuniga,* 66 F.3d 225, 228 (9th Cir. 1995). While the district court is not required to calculate loss with absolute precision, it must "make a reasonable estimate of the loss," U.S.S.G. § 2Bl.l, cmt. n.3(C). "[I]t is not the defendant's burden to disprove loss amounts; the government must generally prove loss by a preponderance of the evidence." *Primer on Loss Calculations Under §2Bl.l(b)(l)* at 14-15 (United States Sentencing Commission (June 2016). In considering the actual loss in a particular case, it must be determined whether the harm was, in fact, "reasonably foreseeable." In determining whether loss is reasonably foreseeable, courts have found that the actual loss must have a "causal link" to the defendant's conduct. *Id.* at 3. As noted, the government's entire loss calculation is based on the total of claims against the bankruptcy estate. Yet the documentation underlying these claims is limited on many claims, and totally non-existent on others. Yet even assuming proper documentation exists on a loss claim justifying the claimed amount, the government has not, and cannot, establish the requisite "causal link" between the loss claim and Reodica's conduct. Indeed, the failure of the GWG was in large part the result of a bad business model: taking early success and expanding the company far too quickly, taking on far too much debt, thus resulting in an inevitable cash flow crisis.[6]

> If you don't plan properly for an increase in business, you can wind up taking on far too much debt. Growth takes money, and especially during the early stages of growth, working capital will be low. Many business owners take on massive debt to feed the growth machine, and a vicious circle begins. Increased orders require you to take on more debt, and so on. Too often, the cycle breaks only because the

---

[5] U.S.S.G. § 2B1.1 was formerly known as § 2Fl .1 under the 1988 Guidelines at issue here.

[6]
*See* 5/23/91 MOI of Louis Brutacao (Mr. Reodica told him GWG's "rapid growth created a need for additional capital." [USA02354].

12

1      debt becomes so high that it topples the business. Even though
2      more money is coming in, you owe even more and can't cover
3      debts.[7]

4 Lenders and employees alike became extremely concerned about the speed by which

5 GWG was expanding its operations.[8] Because of this untenable expansion, GWG began

6 to front payments and double pledge car contracts to try to stay above water. It is

7 impossible to approximate the loss attributable on the one hand to unsustainable

8 expansion from those losses causally attributable to Reodica's conduct. Rapid  expansion

9 of GWG, while perhaps showing poor business judgment, is not criminal. Such an

10 arbitrary calculation would be pure speculation. The loss calculation detailed in the

11 Presentence Report is appropriate in this case.

12

13     **B.  Acceptance of Responsibility: a 2-level Reduction Is Justified.**

14        The government opposes Reodica's receiving any benefit for acceptance of

15 responsibility. The Probation Office declared that Reodica "clearly demonstrated

16 acceptance of responsibility for the offense. Amended PSR, ¶ 57. Accordingly, the

17 offense level is decreased by two levels."  U.S.S.G. §3E1.1(a). *See also United States v.*

18 *Ramos-Medina*, 706 F.3d  932,  940 (9th Cir.), as amended, *cert. denied*, 134 S.Ct. 64 (2013);

19 *and see  United States v. Dhingra*, 371 F.3d 557, 568 (9th Cir. 2004), as amended (holding

20 that a defendant has a burden of demonstrating "genuine contrition" for his acts).

21

22

23       [7]Suzanne Kearns, 5 Dangers of Overly Fast Small Business Growth Strategies,
   http://www.moneycrashers.com/dangers-fast-small-business-growth-strategies.

24       [8]

25   While working at Union Bank in the mid-1980s, Wayne Bradshaw and his superiors initially decided against doing
business with GWG because it was "growing too rapidly" and had no history to judge its potential. [USA00238]. Others
shared Bradshaw's concern, including Reodica's CFO Bruce Li ("Sales at GWG seemed to be good at first; however the

26 company grew too quickly" [USA4608]; 6/20/14 MOI of Joseph Lacognata from Heller International ("Heller was
concerned that REODICA's company was growing too fast") [USA04625]. Other external factors compounded this

27 situation, including that annual operating costs for a new car dealership rose  265% between 1981 to 1988. Brown, *"Wheels
of Fortune,"* Washington Post (February 27, 1989).

28

Reodica wholeheartedly regrets his misdeeds. He admits the facts which support his guilty pleas. He understands and accepts the punishment which commenced upon his arrest on November 27, 2012.  Therefore, Reodica concurs in the recommendation by Probation Office in decreasing his offense level by two levels.

**C.  Mr. Reodica Suffers from a Myriad of Serious Medical Conditions That Support a Substantial Variance**.

Reodica is 72 years old and in very poor health, which provides ample justification for a variance in this case. There is little doubt that health issues make incarceration more difficult for both the defendant and the institution. *See United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (guidelines call for 10-year sentence but defendant sentenced to probation and home detention due to defendant's poor health); *United States v. Rausch*, 570 F. Supp. 2d 1295 (D. Colo. 2008) (defendant's extremely poor health and complexity of his medical needs override any value that further imprisonment would have); *United States v. Hein*, 463 F.Supp.2d 940 (E.D. Wisc. 2006) (variance granted where defendant in extremely poor health, and incarceration would be extremely difficult for both the defendant and the Bureau of Prisons).

**D. Reodica Is 72-years Old and Has No Criminal History.**

In the government's Exhibit C to its sentencing position paper, the government shows several GWG defendants' sentences in a chart. Five out of nine defendants were sentenced to some form of imprisonment. Only one defendant, Bruce Li, served a term of imprisonment which matches what Reodica has already served. Bruce Li commenced his term of imprisonment on March 15, 1991 (Gov't. Exhibit D) and was released on May 16,1995. (*See* Exhibit 9 attached hereto).   Li served a total of 50 months of his 66 month sentence, as three years of his sentence for violation of Count One were for acts

committed prior to November 1, 1987.[9]  When Li was released, he was 36 years old.

Reodica has already served 54 months. He is 72-years old, and had never  even been arrested until this case. Such a lengthy, unblemished history warrants a variance. *See United States v. Paul* 561 F.3d 970 (9th Cir. 2009) (where defendant  convicted of embezzlement and guidelines 10-16 months, court's within guideline  sentence of 15 months unreasonably high in part because Paul was a first-time offender with no criminal record whatsoever); *United States v. Autery,* 555 F.3d 864 (9th Cir. 2009) (defendant convicted of possession of pornography with guidelines of 41-51months, court's *sua sponte* variance to probation not unreasonable in part because defendant's first conviction "did not fully account for his complete lack of criminal history" because a defendant with minor criminal history still falls in Category I.

Consideration of Reodica's age and health is appropriate for several reasons. First, management problems with elderly inmates are intensified in a prison setting and include vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, and the need for special physical accommodations in a relatively inflexible physical environment. *See Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates,* U.S. Department of Justice, National Institute of Corrections (2004 ed.) at 9-10. Reodica's age and health are critical factors under § 3553(a) for the Court to consider before imposing sentence.

**E.   Reodica  Engaged in Exceptional Charitable and Community Activities.**

As stated, *supra*, Reodica's life of public service started at a very young age in the Philippines through scouts, public gardening, serving as student body president, and

---

[9]On March 15, 1991, defendant Li self-surrendered to begin service of his 30-month "new law" sentence. On May 19, 1993 at which time he commenced service of his 3-year "old law" sentence. Li 18 U.S.C. §2255 motion [USA03882].

organization of a college service fraternity.  In Los Angeles, he created a weekly radio

program to reach out to Filipinos in his community. He published a Filipino newspaper.

He helped Filipino-Americans register to vote. He was active in Filipino Diaspora. He

served as chairman of the First "Santacruzan." He was a commissioner of the L. A.

County Tax Appeals Board. Finally he served as a  commissioner for the California State

Dept of Motor Vehicles.

Reodica's long list of community service is exemplary and justifies variance and/

or departure consideration. Courts have granted downward departures for such

extraordinary service to the community.  *United States v. Serafini*, 233 F.3d 758 (3d Cir.

2000)(community service and charitable works performed by defendant, a state legislator

convicted of perjury in a federal grand jury investigation, were sufficiently "extraordinary

and exceptional" to justify three-level downward departure for community and

charitable activities; e.g., providing a $300,000 guarantee for medical treatment of a

terminally ill patient and mentoring a seriously injured college student, and showed

generosity of time as well as money); *United States  v. Woods*, 159 F.3d 1132 (8th Cir.

1998) (defendant's exceptional charitable efforts – bringing two troubled young women

in her home, paying for them to attend private high school – and also assisting elderly

friend to move from nursing home to apartment – justified one level departure); *United

States  v. Jones*, 158 F.3d 492 (10th Cir. 1998) (where defendant pled guilty to possession

of a firearm by a prohibited person, the district court did not abuse its discretion in

departing downward by three levels when, as one of eleven factors, it considered

defendant's long history of community service even though under §§5H1.5 and 1.11

good works are not ordinarily relevant because here "very unusual"); *United States  v.

Bennett*, 9 F.Supp.2d 513 (E.D.Pa. 1998) (in largest charitable fraud in history, where

under §5H1.11 defendant's civic and charitable good deeds were extraordinary, together

16

with other grounds, departure from 232 to 92 months warranted – defendant had substantial contributions in the areas of substance abuse, children and youth, and juvenile justice were well documented and well recognized.); *United States  v. Canoy*, 38 F.3d 893 (7th Cir. 1994) (charitable and civic activities may, if exceptional, provide a basis for departure); *United States  v. Wilke*, 995 F.Supp. 828 (N. D. Ill. 1998) (defendant's contribution to an art and music festival, to theater work, and to his interfaith food pantry warrant departure), *vacated and remanded*, 156 F.3d 749 (7th Cir. 1998); *United States v. Crouse*, 145 F.3d 786 (6th Cir. 1998) (a chief executive officer of company found to have fraudulent distributed orange juice adulterated with sugar, and where judge departed downward 13 levels to impose home confinement where guidelines were 30-37 months, court of appeals will defer to district court's decision that defendant's charitable contribution were outstanding and, together with other factors, justify departure, but extent was an abuse of discretion); *United States v. Rioux*, 97 F.3d 648 , 663 (2d Cir. 1996) (affirming downward departure based on charitable fund-raising conduct as well as poor medical condition).

### F. Restitution Cannot be Justified in This Case.

Imperial Savings suffered $140 million in losses between 1981 and 1985, long before doing business with Reodica. Larry Tye,  *California S&L's Fall From Grace Is Classic Case,* Boston Globe July 22, 1990. When Kenneth Thygerson took over the failing company in 1985, neither he, Rocco Fabiano, who headed Imperial's high-risk lending program, nor  other executives had a background in junk bonds, cars and other areas in which they were investing. *Id.* Thygerson left a job at Freddie Mac where he earned $200,000 per year. His salary at Imperial was initially set at $800,000 per year. Within two years of Thygerson taking over Imperial, the company purchased $1.5 billion in high yield bonds. Half of those involved Drexel Burnham Lambert as the lead seller. Drexel

17

had fed $700 million in junk into Imperial in 1986 and 1987.  Thygerson was fired in
July, 1989. Benjamin J. Stein, *On the Junk Heap, The Trashing of a Multi-Billion
Dollar California Savings & Loan*, Barron's, October 9, 1989 [USA001059-68].

At the time that Imperial Savings was doing business with GWG, Imperial held
junk bonds with a face value of more than $1.3 billion, making it the Savings and Loan
Industry's second-largest junk bond investor at that time. "Imperial has been battered
over the last two years by a series of bad loans and investments in a variety of fields,
including its relationship with a fast-growing automobile dealership that went into
bankruptcy [GWC]. *But the deterioration of its junk bond portfolio proved to be its
biggest problem.*" Richard W. Stevenson, *California Saving Unit Is Seized*, NY Times,
February 24, 1990 (emphasis added).

Reodica is 72 years old, in poor health,  and has been incarcerated for the past
five years. Reodica has no assets.  Although he believes he can sustain himself when he
is released, he currently has no job. His wife of the past twenty five years likewise has no
assets as she was forced to move in with her son in the Philippines.

The issue of whether restitution should be ordered is addressed in 18 U.S.C.
§3663(d). Reodica asserts that the lack of financial resources, along with his financial
needs and earning ability show that he does not have the ability to make meaningful
restitution payments. Additionally, the amount of the loss sustained by each victim,
including the amount of loss claimed by the FDIC, the receiver for Imperial Savings, as
a result of the offense may be impossible to ascertain, or so complicated that the
prolongation of the sentencing  process may outweigh the need to provide restitution to
the victims. Therefore, Reodica requests that this Court refrain from ordering restitution
in this case.

### G.  Post-Offense Rehabilitation Justifies a Variance.

The Ninth Circuit has held that post-offense and post-sentencing rehabilitative efforts shown by exemplary conduct warranted an eleven level downward departure. *United States v. Green*, 152 F.3d 1202 (9th Cir. 1998). In the past five years, Reodica has dedicated himself to the service of God. Reodica sought formal legal education while incarcerated. Since becoming a paralegal, Reodica is well-known at M.D.C. for his tireless efforts as a paralegal on behalf of inmates.  Reodica has regularly communicated with his children and grandchildren by email, offering educational, professional and spiritual advise.

Reodica would like to spend the remainder of his life promoting self sufficiency, and the use of clean energy alternatives. He believes that he will achieve his goals through the use and promotion of solar energy.

Reodica only reflects upon the positive aspects of the past 54 months of imprisonment. He has helped 150 inmates in defending their cases. He has connected with his grandchildren, including one grandchild who is testing possible cures for cancer in Harvard University's microbiology Ph.D. program.   He has ample time to reflect of his past crimes, and looks forward to redemption. In Reodica's own words, "This has been the best place where I could possibly be."

## VI. CONCLUSION

Reodica respectfully requests that this Honorable Court impose a sentence consistent with the Sentencing Guideline calculations prepared by the Probation Office, to which Reodica concurs. If the Court sentences Reodica to an additional period of ///

19

imprisonment, Reodica requests that the Court recommend that the term of
imprisonment be served at FCI Lompoc.

DATED: May 1, 2017                                   _____/s/_____

                                                     JOHN NEIL McNICHOLAS
                                                     464 Palos Verdes Blvd.
                                                     Redondo Beach, CA 90277
                                                     Attorney for Defendant,
                                                     EMINIANO REODICA